Filed 7/16/15  P. v. Araiza CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C075801 |
| Plaintiff and Respondent, | (Super. Ct. No. SF119827A) |
| v. | |
| MIGUEL ARAIZA, JR., | |
| Defendant and Appellant. | |

On the night of March 10, 2012, Osvaldo Jaramillo drove his girlfriend Angelica Osorio to her Lodi home after the couple spent much of the day together.  As the couple stood in the street before parting ways for the evening, a car stopped nearby.  Defendant Miguel Araiza, Jr., a member of the Norteño criminal street gang in Lodi, got out of the car carrying a rifle.  Defendant fired several shots, killing Osorio and wounding Jaramillo.

A jury convicted defendant of murder in the first degree (Pen. Code, § 187 (Count 1)),[1] attempted willful, deliberate and premeditated murder (§§ 664/187, subd. (a) (Count 2)), possession of methamphetamine (Health & Saf. Code, § 11377 (Count 3)), and active participation in a criminal street gang (§ 186.22, subd. (a) (Count 4)). The jury found true a personal use of a firearm enhancement (§ 12022.5, subd. (a)) and a gang-crime special circumstance allegation (§ 190.2, subd. (a)(22)) in connection with Count 1. In connection with Counts 1 and 2, the jury found true allegations of personal use of a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), commission of a felony for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)), and that defendant was a juvenile who personally killed the victim (Welf. & Inst. Code, § 602, subd. (b)(1)). In connection with Count 2, the jury also found true an uncharged enhancement for great bodily injury (§ 12022.7, subd. (a)) and an allegation pursuant to Welfare and Institutions Code section 707, subdivision (d)(1).

On appeal, defendant asserts that: (1) the prosecutor committed misconduct during her closing argument by vouching for the integrity of the police investigation and for the credibility of witnesses, and by denigrating the defense; (2) the trial court violated his right to counsel when it precluded defense counsel from commenting during closing argument that the prosecution did not present evidence that defendant admitted to committing the crimes; (3) the trial court erred in imposing a sentence pursuant to section 12022.7, subdivision (a), where a corresponding allegation was not set forth in the information; and (4) the imposition of a concurrent term of 25-years-to-life imprisonment pursuant to section 190.2, subdivision (a)(22), was unauthorized, and that this sentence must be stricken.

---

[1] Further undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

Defendant forfeited the majority of his claims alleging prosecutorial misconduct. Those claims he did not forfeit are without merit. The trial court did not err when it precluded defense counsel's argument that the prosecution had not presented evidence that defendant admitted commission of the crimes. Defendant also forfeited his claim concerning the imposition of a sentence pursuant to section 12022.7, subdivision (a). However, pursuant to section 12022.53, subdivision (f), that sentence must be stayed. Finally, we agree with defendant and the People that the additional sentence imposed pursuant to section 190.2, subdivision (a)(22), must be stricken.

## FACTUAL AND PROCEDURAL BACKGROUND

### Trial Evidence

#### The Shooting and Investigation

Osvaldo Jaramillo[2] was 18 years old at the time of the trial. He knew defendant because they had attended Lodi Middle School together. Jaramillo knew defendant to be associated with the Norteño criminal street gang. Jaramillo acknowledged that, when he was in middle school, he was "associated with associates" who were members of criminal street gangs. Because Jaramillo spent time with members of the Sureño criminal street gang, he had problems with members of the Norteño criminal street gang "[a]ll the time." Jaramillo and his friends would "go over to the other side with -- with the enemies," meaning the Norteños, and start fights. However, Jaramillo never had any problem with defendant.

Angelica Osorio was Jaramillo's girlfriend. Jaramillo and Osorio dated for approximately one and one-half years. By this time, Jaramillo was no longer associating with gang members. He stopped associating with Sureño gang members after he met Osorio because he fell in love with her and did not have time for anything else.

---

[2] Jaramillo's first name is misspelled "Alsvado" in the Reporter's Transcript.

3

On March 10, 2012, Jaramillo and Osorio spent much of the day together. After watching movies at Jaramillo's house until 10:00 or 11:00 p.m., they drove back to Osorio's house. When they arrived, they got out of the car, said goodnight, and hugged. Jaramillo then heard a car stop nearby. He observed a dark 1990's Honda Accord stopped at a stop sign. Someone got out of the passenger side of the vehicle holding a large, long object and walked over to Jaramillo and Osorio. Jaramillo froze, holding onto Osorio. The individual pointed what Jaramillo called an assault rifle[3] at Jaramillo and Osorio, and asked Jaramillo where he was from. Jaramillo recognized the individual was defendant. According to Jaramillo, by asking where he was from, defendant was asking about gang affiliation. Jaramillo responded, " 'Nowhere. I don't want any problem, please.' " Jaramillo screamed for help and ran. As he started running, Jaramillo heard "a lot" of gunshots, and he heard defendant say, " 'Fuck you, scrap,' " invoking a derogatory term Norteños use against Sureños. Jaramillo fell and he realized that he had been shot. He screamed for help, and when people responded, he told them to call 911. Jaramillo called to Osorio, but she did not respond and was not moving.

Responding police and paramedics found Osorio bleeding from the mouth, unconscious, and without a pulse. She was taken to a hospital where she later died as the result of a gunshot wound to her trunk. Although the bullet recovered from Osorio's body was "markedly deformed," based on its measurements, the caliber of the bullet was estimated to be .21 or .22.

Jaramillo testified that when police arrived, he told them everything he knew about the incident. Lodi Police Corporal Dale Eubanks attended to Jaramillo on the scene. Eubanks testified that Jaramillo told him that "Miguel" did it, and that he knew Miguel from Lodi Middle School. Jaramillo did not know Miguel's last name. Based on

---

[3] Jaramillo called it an assault rifle because the firearm "was long, dark colored, [and] shot really fast."

information provided by Jaramillo, Eubanks directed officers to look for a gray 1994 or 1995 Honda and he broadcasted the suspect's first name. Police recovered six .22-caliber shell casings from the scene.

Jaramillo had been shot four times, sustaining gunshot wounds to his chest, his right side, and two to his right upper thigh and buttock. He also sustained fractures to a rib and his right hip.

At the hospital, Jaramillo gave a statement to Officer Michael Mantzouranis as to the identity of the person who shot him. Mantzouranis relayed that information to Detective Ricardo Garcia, the detective assigned to the case. Subsequently, Garcia sent Mantzouranis an email containing a "six-pack photo lineup." Mantzouranis showed Jaramillo the photo lineup. Jaramillo circled the defendant's photograph and initialed the paper. He told officers that he was "a hundred percent sure who it was."[4]

Detective Carlos Fuentes, a gang detective in the Lodi Police Department, went to defendant's house on March 11, 2012, the day after the shooting, looking for defendant, but did not locate him. Fuentes returned the next day, and, while he was there, defendant called his mother's mobile phone. Fuentes answered the call and told defendant that he needed to speak with him. Defendant told Fuentes that he was in Modesto, on his way to Mexico.

On the morning of March 11, 2012, Detective Garcia participated in the search of defendant's residence. Garcia discovered "a lot of black, red and white clothing, and . . . a Cincinnati Reds hat." Garcia testified that red, white, and black are colors commonly worn by Norteño gang members. Cincinnati Reds hats are commonly worn by members of the South Central Norteños to identify themselves as members, with the "C" representing "Central." Garcia also observed a Champion jacket, which a "lot of South

---

**4** Jaramillo acknowledged that, during the investigation, he provided an incorrect last name for defendant.

Central Nortenos will wear [] to represent Central." Additionally, Garcia found a Norcal shirt with an image of a Huelga bird. The Huelga bird is the symbol of the United Farm Workers. The Nuestra Familia, a prison gang for which Norteños serve as street soldiers and to whom Norteños pay "taxes," adopted the symbol to represent the gang. Garcia also discovered a plastic bindle containing a white, crystal-like substance.

On March 12, 2012, Lodi Police Officer Jose Nuno and several other officers stopped a green Camaro in which defendant was a passenger. There were four individuals in the Camaro. Defendant was seated in the back seat on the passenger side. After the individuals had been removed from the Camaro, police performed an inventory search. On the floor near where defendant had been seated, Nuno found a key card to room 214 at the Delta Royal Hotel. Lodi Police Sergeant Stephen Maynard recovered a digital scale and an orange pill bottle in the car, also on the floorboard where defendant had been seated. The pill bottle contained two bindles containing an off-white crystalline substance. One of the plastic bags in the orange bottle contained dimethyl sulfone, a substance used to dilute methamphetamine. The other plastic bag contained 1.99 grams of methamphetamine.

On March 12, 2012, police searched the house where Jose Quevedo (Jose) and Karely Quevedo (Karely) resided. Karely was defendant's girlfriend, and Jose was her brother. Twenty-two-caliber bullets were found in Jose's room. Jose said he had a .22-caliber rifle, and his uncle or his father's friend gave him the bullets. Jose did not recall giving ammunition to defendant prior to March 10, 2012, and he did not recall telling police that he had done so.[5] Also discovered in Jose's room was a black rifle case. Jose

_____

[5] After responding to several of the prosecutor's questions by stating that he could not remember, Jose testified that he had been "jumped" a couple of months following the shootings, that he had also been in a motorcycle accident, and that these events affected his memory.

6

testified that defendant had given him a case for "[a] gun or like anything you could use it for." Jose had come home late one evening, saw that defendant had the case, and asked defendant if he could have it. When Jose looked inside the case, he observed "little papers and stuff like that." Jose testified he did not recall ever seeing a gun in the case.

Detective Garcia obtained Jose's and Karely's mobile phones. On Jose's phone, he discovered two photographs of a rifle. Jose testified that, although he had told police officers that he found a rifle in the case and photographed himself with it, this was not true. Jose testified that a neighbor had given him an air rifle, and it was the air rifle that appeared in the photographs.

Jose testified that he did not recall whether he was truthful when he spoke with police or whether he lied because he had concerns about a criminal case involving a gun charge pending against him. He testified that he "[p]robably" lied so that officers would not think that a gun belonged to him.

Karely testified that defendant would regularly come to her house, but her parents would not see him because she would sneak him in. Karely testified that defendant was in her room with her from 8:30 p.m. on March 10, 2012, until 9:00 a.m. the following morning.

Karely acknowledged sending a text message to defendant on March 12, 2012, at 1:07 p.m., in which she stated, " 'If you ever do anything again I'll ooo I'm not even gunna tell you but think about it.' " She testified that she had been angry because defendant cheated on her. Defendant had responded by text, " 'I'm not ever gunna do nothing again,' " and Karely replied, " 'You better not Ima about to have a bitch fit so I'll text you later.' "

On March 13, 2012, Sergeants Maynard, Alexander, and Rench searched room 214 of the Delta Royal Hotel in Galt. Maynard observed a couple of shirts and hats, and collected the hats as evidence. Each cap bore the letter C.

7

Donald Robert Guerrero testified that, on March 1, 2012, his house was burglarized. Among the items taken from the house was a .22-caliber Sig Sauer rifle. The gun came with a case and perhaps two 10-round clips for ammunition. Guerrero identified a case pictured in People's Exhibit 26, a photograph of the case recovered from Jose's room, as the case that came with the rifle.

**Gang Evidence**

According to Jaramillo, the Norteños and the Sureños are criminal street gangs and enemies. Sureños typically wear blue, brown, flannel shirts, Dickies, and Cortez tennis shoes. Norteños typically wear red and black, and wear baggy clothing and saggy pants. To insult or disrespect a Norteño, a Sureño would call the Norteño "[b]uster or chap." To disrespect a Sureño, a Norteño would use the term "[s]crap." The Sureños had a particular area in Lodi which was considered their territory, as did the Norteños. The area where the shooting occurred was Sureño territory.

Stefanie Grijalva, a juvenile-unit supervisor, testified concerning an incident on April 21, 2010, when defendant, a resident at the juvenile detention center, was disciplined for refusing to count off as number 13 in line. Fuentes testified that 13 is a number identified with Sureños. Norteño would not say that number as a matter of pride.

Christopher Henderson, a unit supervisor at a juvenile detention center, testified that he reviewed items of mail sent to juveniles housed at the center for improper content and/or contraband. On May 14, 2012, Henderson reviewed a letter sent to defendant, and observed that it contained a reference to "SCL." Henderson withheld the letter as inappropriate.

Alicia Jackson, who worked at the juvenile detention center, testified that, on October 26, 2012, in the recreational yard, she heard defendant saying, "It's all about the gangster." She notified defendant that these were inappropriate gang-related comments. Defendant responded that he was simply singing a song. Jackson told defendant the song was inappropriate, and defendant replied, "You all staff need to understand the gang life

8

is all we are about." On November 24, 2012, Jackson inspected the room in which defendant was housed. She observed writings in the room including "X4," which is "Nortenos tagging."

Marco Mendoza, a custody correction officer at the San Joaquin County Sheriff's Department, conducts interviews with individuals housed in the jail facility. On January 7, 2013, Mendoza conducted an interview with defendant, who said he was a Norteño member from South Central Lodi.

Detective Fuentes testified as an expert in Hispanic criminal street gangs in Lodi. Fuentes testified that, as of March 10, 2012, there were approximately 75 documented Norteños in Lodi, and approximately 55 Sureños. According to Fuentes, common symbols used by Norteños include "XIV, the 14" and the Huelga bird.

Fuentes testified that respect is very important within gang culture. Gangs gain respect through violence. They want members of the community and rival gang members to fear them. Fuentes testified that, if gang members see a rival, they will attack. "That's the way it is with the gang culture. That's what they do."

Fuentes testified that it is "pretty easy nowadays" for gang members to acquire guns. They can either alert another gang member to the fact that they need a gun, or steal a gun by breaking into a house.

Fuentes was of the opinion that, as of March 10, 2012, defendant was an active member of the Norteño gang. His opinion was based on prior contacts with defendant, defendant's admissions, defendant's tattoos, and his associations. Based on a hypothetical question mirroring the facts of the shooting, Fuentes opined that the shooting benefited the Norteño criminal street gang.

**Verdict and Sentencing**

The jury convicted defendant of murder in the first degree, attempted willful, deliberate and premeditated murder, possession of methamphetamine, and active participation in a criminal street gang, and found the enhancements and special

9

circumstance to be true. On February 3, 2014, the trial court sentenced defendant to an aggregate term of 50 years to life imprisonment. As will be discussed *post*, the court, among other things, imposed a three-year consecutive sentence pursuant to section 12022.7, subdivision (a), and a concurrent term of 25 years to life pursuant to section 190.2, subdivision (a)(22).

## DISCUSSION

### I. Prosecutorial Misconduct

Defendant claims that the prosecutor committed misconduct during her closing argument by vouching for the integrity of the police investigation, vouching for the credibility of prosecution witnesses, and denigrating the defense. Defendant further asserts that this alleged misconduct denied his right to a fair trial. The majority of defendant's contentions have been forfeited. To the extent they have not, they are without merit.

### A. Background

To give context to the prosecutor's arguments, we first summarize testimony provided by Lodi Police Department personnel that the prosecutor addressed in her remarks.

Officer Mantzouranis testified he recorded his interview of Jaramillo on a digital recorder or on his mobile phone. He emailed that file to Detective Garcia, but he did not otherwise preserve the interview. When he received it, Garcia could not open the file, and he did not attempt to get help doing so, since he "had all the information [he] needed." Mantzouranis believed that he deleted the file after sending it to Garcia. Mantzouranis acknowledged that he "should have probably booked that before [he] sent that to Detective Garcia" or at some point during the investigation. Mantzouranis also acknowledged that he did not indicate in his report that he had recorded his interview with Jaramillo. Garcia acknowledged that, if a recording is made during an investigation, it should be booked into evidence. He also acknowledged that he did not indicate in his

10

report that he received a file that he was unable to open. Garcia testified that he thought Mantzouranis would preserve the recording and book it into evidence. Garcia did not discover that Mantzouranis had not done so until November 2013, at which time he searched his email to locate a copy of the file, and he requested that Mantzouranis do the same. He also requested that Mantzouranis check the device on which he made the recording. Garcia also consulted with police department technicians. However, he was unable to locate the file.

As the prosecutor commenced her closing argument, she stated, "I also want to remind you that this is the People of the State of California versus Miguel Araiza. He is the only person in this courtroom charged with a crime. No one else is. The Lodi Police Department is not on trial. The defendant, Miguel Araiza, is on trial for the murder of Angelica Osorio and the attempted murder of Osvaldo Jaramillo and the other related crimes. Don't get caught up in some type of conspiracy theory because that is when you start violating your oath as a juror and going outside of what the facts and the evidence and the application of the law is."

The prosecutor subsequently stated that there were "categories" of witnesses. These included "independent" witnesses, such as doctors and police officers. She contrasted such witnesses with "connected" witnesses, such as family, friends, and gang members. She stated that it would become clear to the jury "who the connected and . . . who the independent were."

The prosecutor noted that evidence had been elicited establishing that Corporal Eubanks falsified a report in an unrelated case. She asserted that the jury had to decide whether that had "anything to do with anything." She further stated, "I'm going to suggest to you that it does not, but you have the right to know that because you have to have all of the information in order to make an educated decision."

The prosecutor followed that statement by saying, "The same thing, you've been told that Officer Mantzouranis and Corporal Garcia destroyed a tape, the interview of

11

Osvaldo Jaramillo at the time he identified the defendant via photographic lineup. I'm going to suggest the following to you: What is the most important evidence? Mr. Jaramillo himself, and you had him. There was ample opportunity for full cross-examination, and if there -- as you watched and observed with every other witness in this case there was something that was different. [¶] And the other thing is [] that it was clearly an act of negligence on the officers' part. They should have communicated with each other. Clearly, it's not conduct that they engage in on a regular basis, and you know that because you yourself had an opportunity to see the two interviews that Corporal Garcia was responsible for were audio and videotaped, so you know this isn't an ongoing pattern of conduct. So again, take it into consideration. It's out there. Again, it doesn't appear to have much weight to it, but that's ultimately for you to decide."[6] Defense counsel registered no objections to any of the prosecutor's comments in her argument-in-chief.

As defense counsel commenced her closing argument, she stated, "This case is about mistakes. Mistakes made by the police in their investigation, mistaken identities and mistaken assumptions. The mistakes made throughout this case influenced the witnesses, the evidence and eventually the overall case. The mistakes permeated the case from the beginning to the end." Defense counsel emphasized several purported mistakes, including Lodi Police Officer Dunfee writing the incorrect response time on his report; Detective Fluty's assumption that defendant was the suspect based solely on Eubanks's identification of the suspect as "Miguel"; Detective Garcia's failure to create a fair and

---

[6] The court instructed the jury with a special instruction offered by defendant. "You have heard evidence that a witness made a statement to a police officer after the incident. I am referring to the statement taken in the early morning hours of March 11, 2012 at the hospital. Officers Mantzouranis and Garcia destroyed the only copy of the audio recording of the interview. [¶] In evaluating the weight and significance of that evidence, you may consider the effect, if any, of the destruction of the audio recording."

12

impartial photo lineup; and Detective Fluty's testimony that his report stated the incorrect address as where he conducted surveillance.

Defense counsel addressed in detail Garcia's and Mantzouranis's failure to preserve the audio recording of the interview with Jaramillo, stating, "The evidence was destroyed by the same people who created it: The police. And this is more than just a mere mistake. This is more than just mere negligence on this part or as Officer Mantzouranis said, 'I should have done it.' It's a murder investigation. I should have done it doesn't cut it. This is completely unacceptable police conduct. They're trained not only to collect the evidence . . . , but they're also trained to preserve it. [¶] And not only did they destroy the evidence, but somehow Officer Mantzouranis and Officer Garcia conveniently forgot to mention in the reports that it even existed in the first place. They're trained to write reports, trained to put down what evidence is collected and what's booked, and they're trained to be thorough, yet none of the training was adhered to in this case."

Defense counsel continued, "Again, it's cumulative. Look at all the mistakes, not just one of the mistakes." She asserted that the cumulative effect of police mistakes contaminated the investigation. Defense counsel emphasized the circumstances which, she argued, could lead to an erroneous identification of defendant by Jaramillo, including that it was dark and his attention was focused on the gun.

Defense counsel also argued that Jose "ha[d] every reason to lie," that he was the only person known to have possessed the gun, that he had pending gun charges, that he had bullets of the caliber used in the shootings, and that he did not recall where he was at the time of the shooting. According to defense counsel, the People's evidence was more consistent with a conclusion that Jose was the shooter, not defendant.

In her rebuttal, the prosecutor began, "It's called the SODDI argument: Some Other Dude Did It. There's no information to support it. There's no facts to support it. There's no evidence to support it. [¶] But who's the lame duck in the room? Jose

13

Quevedo. But if you don't buy that, it's the D.A.'s fault because she's trying to scare you. Not talking about the facts. Not talking about the evidence, but then it's the D.A. And if that isn't enough, you need to believe that every single person within the Lodi Police Department is willing to give up their job, willing to frame an innocent gangster just for what end?" Defense counsel registered no objection.

The prosecutor acknowledged that there were mistakes made in the investigation. She told the jury, "Were there mistakes made in this case by law enforcement? Yes. They came out. No one tried to hide anything. I'm sure it was quite embarrassing. But where is the evidence that it had any influence on anything?" No objection was made to the comment that "[n]o one tried to hide anything."

The prosecutor again acknowledged that the audio recording of the interview with Jaramillo was missing. However, she observed that it was documented in writing. She further stated, "And if it was something that was inconsistent, do you think it wasn't going to be attacked? Do you think it wasn't going to be used to attack him when he was up here?" Again, no objection was made.

The prosecutor then stated, "If you don't have the law, you argue the facts. If you don't have the facts, you argue the law. And if you don't have either one of them on your side, you come up and throw anything up there and you hope it sticks on somebody." Defense counsel objected, but the objection was overruled.

The prosecutor discussed how red herrings were once used to throw hounds off the scent in fox hunts and equated the defense argument to a red herring. She suggested that there was no support for the premise that the loss of the audio recording changed the course of the investigation. She stated, "Where is the foundation for an argument that the loss, destruction, whatever you want to call it of the interview with Osvaldo Jaramillo . . . changed the course of this investigation? Where is it? See, you don't get to just throw it out. It doesn't matter who's in this room, you don't get to just throw something out there and say it's so. Proof is required by any type --" Defense counsel objected on the ground

14

that the prosecutor was shifting the burden of proof and the defense had no burden. Without waiting for a ruling by the trial court, the prosecutor responded, "That is absolutely correct. And I am not shifting the burden. It never shifts. There is no burden upon this defendant. There's no burden upon the defense. But if you're going to take a statement and you're going to utilize it, you have to have foundation for it. There has to have something as a foundation to give it veracity. There has to be integrity in this process. If you don't have integrity, we don't have justice for anyone. This burden never shifts. [¶] But you have an obligation before you jump on the shiny object in the room to have some foundation and proof of the validity of that. That's the point. This isn't a shifting. The People have 100 percent of the burden, have had it from the beginning of this case, accept it and hold it to this moment. But there is absolutely nothing that would indicate that the mistakes that were made by law enforcement support the argument that it derailed the investigation and the identification because if you're going to go on to that type of a mindset, you then have to -- Lodi Police Department on March the 10th of 2012, about 11:43 p.m. decided at that moment they were going to frame Miguel Araiza. Out of everyone else in the world that they could pick, they're going to frame Miguel Araiza."

Later, the prosecutor set forth the ways in which she asserted that any "conspiracy theory" was disproved by the evidence. The prosecutor asserted that, for the defense's argument to be accepted, the jury would have to believe that Jaramillo was instructed by police to choose defendant in the photo lineup. The prosecutor stated that this was "the only way that this conspiracy theory can fit to exonerate the defendant. It's ridiculous and it's ludicrous." Defense counsel objected, and the court overruled the objection, instructing the jury that "[t]his is argument and only argument."

As she concluded her argument, the prosecutor stated, "And what do the police get out of this? They've been berated. They've been embarrassed. They've been chastised and they've been attacked. What else do they get out of this whole thing by framing this

15

innocent guy?  What do they get out of it?  What does Osvaldo Jaramillo get out of it?  He's now come and testified in a gang homicide, told about his prior connections to a gang against a gang member.  What does he get?"

## B.  Standard of Review

"The standards governing review of misconduct claims are settled.  'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.]  Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.  [Citation.]  In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.  [Citation.]'  [Citation.]" (*People v. Parson* (2008) 44 Cal.4th 332, 359; see also *People v. Centeno* (2014) 60 Cal.4th 659, 674.)

"[T]he prosecutor has a wide-ranging right to discuss the case in closing argument.  [She] has the right to fully state [her] views as to what the evidence shows and to urge whatever conclusions [she] deems proper." (*People v. Lewis* (1990) 50 Cal.3d 262, 283.)  To prevail on a claim of prosecutorial misconduct in argument to the jury, the defendant must show a reasonable likelihood that the jury understood or applied the prosecutor's comments in an improper or erroneous manner. (*People v. Frye* (1998) 18 Cal.4th 894, 970 (*Frye*).)

## C.  Forfeiture

As noted, defense counsel did not object or request an admonition at any time during the prosecutor's closing argument-in-chief.  Additionally, no objection was made as to some of the rebuttal comments defendant now complains about on appeal.  Nonetheless, defendant claims that the prosecutor's improper remarks were so persistently interspersed throughout the entirety of her closing argument that objection

would have been futile, and, accordingly, we should consider his claims on appeal.  (See *People v. Kirkes* (1952) 39 Cal.2d 719, 726 (*Kirkes*); see also *People v. Hill* (1998) 17 Cal.4th 800, 820-821 (*Hill*).)  We disagree.

By failing to object, counsel for defendant did not seize the opportunity to obtain a ruling from the court that might have tempered any inappropriate remarks.  (See *People v. Dennis* (1998) 17 Cal.4th 468, 521.)  Moreover, we disagree with defendant's contention that the challenged remarks "were interspersed throughout the closing argument in such manner that their cumulative effect was devastating" so as to constitute "flagrant misconduct" which would render any objection or admonition futile.  (*Kirkes*, *supra*, 39 Cal.2d at p. 726.)

Defendant's contentions related to the comments made during the prosecutor's closing arguments for which he did not object in the trial court are forfeited.  (*People v. Cole* (2004) 33 Cal.4th 1158, 1201-1202.)  We now consider those claims of prosecutorial misconduct relating to the prosecutor's rebuttal which were not forfeited by defendant.

### D.  Vouching for Integrity of Investigation and Truthfulness of Witnesses

"A prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record.  [Citations.]  Nor is a prosecutor permitted to place the prestige of her office behind a witness by offering the impression that she has taken steps to assure a witness's truthfulness at trial.  [Citation.]  However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be characterized as improper vouching. [Citations.]"  (*Frye*, *supra*, 18 Cal.4th at p. 971.)

During her rebuttal argument, the prosecutor stated that, for the defense's argument to be accepted, the jury would have to believe that police instructed Jaramillo

17

to identify defendant in the photo lineup, and asserted that this was "the only way that this conspiracy theory can fit to exonerate the defendant. It's ridiculous and it's ludicrous." Defense counsel objected.[7]

We do not agree with defendant that the prosecutor impermissibly vouched for the prosecution's witnesses. Defendant's reliance on *United States v. Weatherspoon* (9th Cir. 2005) 410 F.3d 1142, is misplaced. In *Weatherspoon*, the court held that the prosecutor impermissibly vouched for the credibility of the law enforcement witnesses by arguing that the officers would be fired, lose their pensions, and risk prosecution for perjury if they lied, none of which made any sense "because they came in here and told you the truth, ladies and gentlemen." (*Id*. at p. 1146) The *Weatherspoon* court reversed the conviction based on prosecutorial misconduct including the prosecutor's remarks vouching for the credibility of witnesses. (*Id*. at p. 1152.)

Here, as to the comment for which defendant registered an objection, the prosecutor was not impermissibly vouching for the credibility of police witnesses; she was rebutting the theory and inferences relied upon by the defense that a succession of errors committed by police officers had unjustly led to the prosecution of defendant. This case is like *People v. Caldwell* (2013) 212 Cal.App.4th 1262, where, although the prosecutor made a similar argument about the consequences to the officers if they committed perjury, "he was not vouching for their credibility; he was rebutting the

---

**7** Defense counsel objected only by stating, "Objection. Improper." As a general matter, this general objection was insufficient to properly preserve defendant's claim of vouching on appeal. The rule is that a defendant cannot complain on appeal of misconduct by a prosecutor at trial unless counsel made the objection "*on the same ground*" he asserts on appeal. (*People v. Stanley* (2006) 39 Cal.4th 913, 952; *People v. Berryman* (1993) 6 Cal.4th 1048, 1072.) Defendant never objected on the ground that the prosecutor's comments amounted to vouching for the integrity of the investigation and prosecution witness credibility. In any event, for the reason discussed, defendant's claim is without merit.

defense attorney's charge that the officers had lied about the photo lineup." (*Id.* at p. 1271.) Similarly, our high court in *People v. Dykes* (2009) 46 Cal.4th 731, 774, held that a prosecutor's remark to jury that, " 'If you believe [defendant], Sergeant Chenault is lying, risking his career and everything it stands for, to somehow frame this man,' " constituted fair comment on the evidence. Likewise, the prosecutor's remarks here constituted fair comment on the evidence.

### E. Denigrating Defense Counsel

"A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel." (*Hill*, *supra*, 17 Cal.4th at p. 832.) "It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense [citations], or to imply that counsel is free to deceive the jury [citation]. Such attacks on counsel's credibility risk focusing the jury's attention on irrelevant matters and diverting the prosecution from its proper role of commenting on the evidence and drawing reasonable inferences therefrom. [Citations.] [¶] Nevertheless, the prosecutor has wide latitude in describing the deficiencies in [defense] counsel's tactics and factual account. [Citations.]" (*People v. Bemore* (2000) 22 Cal.4th 809, 846 (*Bemore*).) "An argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper." (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302, fn. 47.)

During the prosecutor's rebuttal argument, the prosecutor stated, "If you don't have the law, you argue the facts. If you don't have the facts, you argue the law. And if you don't have either one of them on your side, you come up and throw anything up there and you hope it sticks on somebody." Defense counsel objected by stating, "Objection. Improper."[8] Contrary to defendant's contention, this remark did not constitute

---

[8] Defense counsel subsequently objected that the prosecutor improperly shifted the burden of proof. However, on appeal, defendant's contentions are that the prosecutor

prosecutorial misconduct.  As the California Supreme Court stated in a case involving a remark, in essence, identical to that challenged by defendant here, "in context, the prosecutor could only have been understood as cautioning the jury to rely on the evidence introduced at trial and not as impugning the integrity of defense counsel." (*People v. Breaux* (1991) 1 Cal.4th 281, 306.)  The same reasoning applies here.  This remark did not constitute prosecutorial misconduct.

### F.  Ineffective Assistance of Counsel

Defendant asserts that, inasmuch as defense counsel failed to preserve his challenges to the prosecutor's alleged misconduct, he was denied the effective assistance of counsel.  We disagree.

To establish ineffective assistance of counsel, a defendant must show (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 691-692 [80 L.Ed.2d 674] (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216-217 (*Ledesma*).)  " 'Surmounting *Strickland*'s high bar is never an easy task.' [Citation.]" (*Harrington v. Richter* (2011) 562 U.S. 86, ___ [178 L.Ed.2d 624, 632] (*Richter*), quoting *Padilla v. Kentucky* (2010) 559 U.S. 356, ___ [176 L.Ed. 284, 297].)

To establish prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' " (*Richter*, *supra*, 178 L.Ed.2d at p. 642.)  To show prejudice, defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Strickland*, *supra*, 466 U.S. at pp. 693-694; *Ledesma*, *supra*, 43 Cal.3d at pp. 217-218.)

---

committed misconduct in vouching for the integrity of the police investigation and the prosecution's witnesses, and in denigrating the defense.  Defendant has not raised the burden-shifting contention in this appeal.

"A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; accord, *Ledesma*, at p. 218.)

" 'Failure to object rarely constitutes constitutionally ineffective legal representation . . . .' " (*People v. Huggins* (2006) 38 Cal.4th 175, 206 (*Huggins*), quoting *People v. Boyette* (2002) 29 Cal.4th 381, 424.) "Moreover, '[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' " (*Huggins*, at p. 206, quoting *People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069.)

We cannot conclude that counsel's performance was deficient for her failure to object to various remarks made during closing arguments which defendant now claims constituted prosecutorial misconduct. "These were not situations in which there could be no satisfactory explanation for counsel's failing to object to the remarks of which defendant now complains." (*Huggins*, *supra*, 38 Cal.4th at p. 206.) For example, in a number of these instances, counsel could have preferred not to draw additional attention by repeatedly objecting to certain of the prosecutor's remarks, in which the prosecutor attacked what she perceived to be the deficiencies in defense counsel's arguments. (See *Huggins*, at p. 206; *Bemore*, *supra*, 22 Cal.4th at p. 846.) Moreover, to the extent that certain remarks complained of did not constitute prosecutorial misconduct, counsel cannot be faulted for abstaining from futile or meritless objections. (*People v. Price* (1991) 1 Cal.4th 324, 386-387; see also *People v. Stratton* (1988) 205 Cal.App.3d 87, 97.) Thus, we cannot conclude that counsel's performance fell below an objective standard of reasonableness.

Furthermore, even if counsel's performance could be deemed deficient, given the overwhelming evidence in this case, there is no reasonable probability that, had counsel made the objections now raised and had those objections been sustained, the trial would

have concluded in a result more favorable to defendant.[9]  Defendant was immediately identified as the shooter by a victim who had known him from middle school.  The identification was unequivocal.  Defendant was a Norteño and the victim was associated with Sureños, rivals of the Norteños.  Defendant lied to investigators, telling them he was on his way to Mexico, thus evincing a consciousness of guilt for having shot the victims here.  He continued to hide out after knowing he was wanted, and made the police look for him to secure his arrest, again evincing a consciousness of guilt.  During this time, he made what could be considered damaging admissions by text to his girlfriend, promising to " 'not ever gunna do nothing again.' "  He gave a case for a .22-caliber Sig Sauer rifle to his girlfriend's brother and the murder victim was killed with a bullet that was possibly of the same caliber.  Nothing the prosecutor said, nor defense counsel's failure to object, resulted in prejudice.

## II.  Right to Counsel

Defendant asserts that the trial court erred in refusing to permit counsel to challenge the strength of the prosecution's case by emphasizing in closing argument that the prosecutor presented no evidence that defendant admitted committing the crimes charged.  Defendant claims that this error violated his right to counsel, since his right to counsel includes the right to have his theory of the case argued to the jury.  Defendant's contention is without merit.

---

[9]  Defendant also asserts that the "cumulative effect of the pervasive misconduct" deprived him of a fair trial, and thus cannot be deemed harmless.  However, since we conclude that the defendant's claims have been forfeited or are without merit, we need not reach defendant's contention in this regard.

## A. Additional Background

Defendant made three separate statements to the police and eventually admitted shooting the victims here.[10] The trial court overruled defendant's in limine motion seeking to exclude his statements on *Miranda*[11] and voluntariness grounds. The prosecutor did not introduce the statements into evidence during the trial.

During her closing argument, defense counsel stated, "All the mistakes and suggestions influence the witness, and unfortunately led to mistaken identification because there is no other evidence linking Miguel to this crime. There are no fingerprints. There are [*sic*] no DNA. There is no evidence of a statement that Miguel said he was responsible for the shooting." The prosecutor objected. At a bench conference, the prosecutor argued that it was improper to "argue a negative to try to put the defendant's statement that was not introduced during the course of trial. That is exactly what she did. She commented on the lack of the defendant's statement when he

---

[10] The trial record provides no insight into what defendant told the police. However, at the preliminary hearing, an officer testified about the statements defendant made. Defendant's story changed several times. Initially, defendant denied any participation in the shooting, saying he spent the entire night at his girlfriend's house. Later, he said he was present, but was not the shooter. He said the shooter was a person named Bravito. Defendant said Bravito offered to pay defendant to kill Osorio, who was Bravito's ex-girlfriend. Instead, Bravito shot her. Later in the interview, defendant admitted he was the shooter, but he said he did not mean to kill "an innocent person" and did not intend to kill anyone. Defendant said he knew Jaramillo from middle school, where the two of them got in a couple fights. Defendant said that before the shooting, he asked Jaramillo if he banged to make the shooting look gang related. Defendant said as he held the rifle, he blacked out, and he then became aware of his surroundings when he heard Osorio screaming. He dropped the rifle, picked it up, and walked off. In a third interview, defendant said Bravito had asked him to kill Osorio, not Jaramillo. Even after he was told Osorio did not have an ex-boyfriend, defendant insisted that Bravito said he was her former boyfriend and that defendant did the shooting for the money. However, he was never paid.

[11] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

23

did not testify, and there is no evidence. She's trying to get in a denial of the charge by making that comment, and it is absolutely inappropriate." Defense counsel asserted that she was entitled to comment on the evidence that was introduced, and observed that there was no evidence introduced, presumably referring to evidence of any admission by defendant. The prosecutor responded that it was inappropriate to comment on "nonevidence" and reiterated her contention that defense counsel was attempting to enter a denial by defendant while not having defendant testify subject to cross-examination. The court observed there was no evidence defendant made a statement. Defense counsel contended that her argument was the same as arguing there were no fingerprints. The court disagreed and sustained the prosecutor's objection.

### B. Analysis

"It is firmly established that a criminal defendant has a constitutional right to have counsel present closing argument to the trier of fact. [Citations.] Nonetheless, it is equally settled that a judge in a criminal case 'must be and is given great latitude in controlling the duration and limiting the scope of closing summations.' [Citations.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1184.) "A criminal defendant's constitutional rights to counsel and to a jury trial encompass a right to have his [or her] theory of the case argued vigorously to the jury. [Citations.]" (*United States v. DeLoach* (D.C. Cir. 1974) 504 F.2d 185, 189 (*DeLoach*).)

By seeking to argue that "[t]here [wa]s no evidence of a statement that [defendant] said he was responsible for the shooting," the defense was not emphasizing a deficiency in the evidence proffered by the prosecution relevant to any element of the crimes charged. Allowing the defense to advance this argument would have created the substantial danger of leaving the jury with the false impression that defendant had denied commission of the crimes without having him testify subject to cross-examination. As noted in a case upon which defendant relies, a trial court can preclude arguments "that misrepresent the evidence . . . or otherwise tend to confuse the jury." (*DeLoach*, *supra*,

24

504 F.2d at p. 189.)  The trial court did not abuse its discretion in sustaining the prosecutor's objection.

Defendant is correct in asserting that the Due Process Clause requires the prosecution to prove every element of the crimes charged beyond a reasonable doubt.  (*In re Winship* (1970) 397 U.S. 358, 364 [25 L.Ed.2d 368] (*Winship*); *People v. Loy* (2011) 52 Cal.4th 46, 72.)  Defendant is also correct that reasonable doubt may arise from the lack of evidence in a case as well as from the evidence presented at trial.  (*People v. Simpson* (1954) 43 Cal.2d 553, 566; *People v. Flores* (2007) 153 Cal.App.4th 1088, 1092.)  However, we disagree with defendant's premise that, based on these rules, defense counsel had the right to argue in closing that the People failed to produce evidence of a statement by him that he admitted responsibility for these crimes.  An admission is not an element of any of the crimes charged which the People were required to prove beyond a reasonable doubt.  Defendant notes that a party may comment on the failure of the other party to call logical witnesses and admit material evidence, citing decisions allowing a prosecutor to make such comments during closing arguments -- *People v. Gonzales* (2012) 54 Cal.4th 1234, 1275, *People v. Brady* (2010) 50 Cal.4th 547, 565-566, and *People v. Woods* (2006) 146 Cal.App.4th 106, 112.  However, even assuming the trial court did not have the discretion to prevent the false impression that defendant denied shooting the victims and that defense counsel's argument should have been allowed, any error is harmless.  Defense counsel was not prevented from arguing that the prosecution did not meet its burden.  Counsel made a variety of arguments in this regard, including that the police investigation was deficient, that the deficient investigation tainted Jaramillo's identification of defendant, and the absence of fingerprints, DNA, and the murder weapon.  Pointing out there was no evidence defendant took responsibility for the shooting was only one sentence in the entire closing argument.  Based on the minor nature of the argument that was precluded and the overwhelming evidence in the case, which we summarized in our discussion related to

25

defendant's ineffective assistance of counsel claim, we conclude that any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].)

### III.  Section 12022.7, Subdivision (a), Great Bodily Injury Enhancement

Defendant asserts that the trial court erred in imposing a three-year term of imprisonment pursuant to section 12022.7, subdivision (a), in connection with his conviction of premeditated attempted murder since that enhancement was not pleaded in the information. Defendant asserts that, because the imposition of a sentence on an enhancement which was not pleaded in the information is unauthorized, the three-year term must be stricken. We agree with the People that, under the rationale set forth in *People v. Houston* (2012) 54 Cal.4th 1186 (*Houston*), defendant has forfeited his claim. However, based on section 12022.53, subdivision (f), we further conclude that the sentence imposed pursuant to section 12022.7, subdivision (a), must be stayed.

Pursuant to section 1170.1, "All enhancements shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact." (§ 1170.1, subd. (e).) Section 12022.7, subdivision (a), states, "Any person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years."

In *Houston*, the defendant claimed that he was improperly sentenced to life imprisonment on each count of attempted murder because the indictment failed to allege pursuant to section 664 that the attempted murders were willful, deliberate, and premeditated. (*Houston*, *supra*, 54 Cal.4th at p. 1225.) Instead, the indictment alleged, insofar as relevant, that the defendant "violated 'Section 664/187 . . . , to wit:  did willfully and unlawfully attempt to commit the crime of murder in violation of Section 187 . . . in that he did willfully and unlawfully, and with malice aforethought, attempt to murder [the victim], a human being.' " (*Id.* at p. 1226.) The indictment did not allege

26

that the attempted murders were deliberate and premeditated. (*Ibid.*) During trial, the court presented the parties with a draft of the verdict forms, which required the jurors to determine whether the attempted murders were willful, deliberate, and premeditated. (*Ibid.*) The court sought to clarify this issue, stating its understanding that the prosecution intended to charge premeditated attempted murder, specifically " 'the type of attempted murder [that is] punished by life imprisonment rather than five, seven, nine.' " (*Ibid.*) The court explicitly stated that, if this was not correct, the parties should notify the court. (*Ibid.*) Subsequently, the court specified that it intended to have the verdict form set forth deliberate and premeditated attempted murder as a special finding. (*Ibid.*) At the close of all evidence, the court instructed the jury on the definition of attempted murder, and directed the jury to determine whether the attempted murders were willful, deliberate, and premeditated. (*Ibid.*) The jury found that they were. (*Ibid.*) Defendant did not object before the court submitted the case to the jury or at sentencing. (*Ibid.*)

The California Supreme Court observed that it was undisputed that the indictment did not comply with section 664. (*Houston*, *supra*, 54 Cal.4th at p. 1226.) Our high court further noted that the trial court notified the defendant of the sentence he faced before the case was submitted to the jury, and the defendant had sufficient opportunity to object and request additional time to formulate a defense. (*Id.* at p. 1229; contra, *People v. Arias* (2010) 182 Cal.App.4th 1009.) The Supreme Court further observed that the jury had been properly instructed, and that it had made an express finding that the attempted murders were willful, deliberate, and premeditated. (*Houston*, at p. 1229) Based on all of these facts, the Supreme Court concluded that the defendant forfeited his claim that the indictment failed to comply with section 664. (*Ibid.*)

Here, count two did not contain an explicit allegation pursuant to section 12022.7, subdivision (a), that defendant personally inflicted great bodily injury on Jaramillo in the commission of count two. Defendant acknowledges that the parties discussed CALCRIM No. 3160, the section 12022.7 great bodily injury jury instruction, and that the instruction

27

was given, as modified, without objection from the defense. The verdict form directed the jury to enter a finding as to whether, in the commission of the crime alleged in count two, defendant inflicted great bodily injury upon Jaramillo within the meaning of section 12022.7, subdivision (a), and the jury found, beyond a reasonable doubt, that he did. At sentencing, the trial court imposed a three-year term of imprisonment on the enhancement pursuant to section 12022.7, subdivision (a), again without objection.

We agree with the People that the circumstances of this case are analogous to those in *Houston*. The trial court and the parties discussed the jury instruction to be provided pursuant to section 12022.7, subdivision (a), and the defense agreed to the instruction as modified. The verdict form required the jury to make a finding as to the relevant allegation. The record reflects no objection to the verdict form. Defendant had sufficient opportunity to object to the inclusion of the section 12022.7 great bodily injury enhancement and request additional time to formulate a defense. The trial court properly instructed the jury that it was to enter a finding as to whether, in the commission of the attempted murder, defendant inflicted great bodily injury on Jaramillo. The jury did, in fact, find that allegation to be proven beyond a reasonable doubt. On these facts, we conclude that defendant forfeited his claim that the information failed to comply with sections 1170.1, subdivision (e), and 12022.7, subdivision (a). (*Houston*, *supra*, 54 Cal.4th at p. 1229.)[12]

Defendant asserts that, in the event our determination is in accord with *Houston*, defense counsel was ineffective for failing to object to the submission of the uncharged

---

[12] While, unlike *Houston*, the trial court here did not specifically discuss the additional sentence defendant faced pursuant to section 12022.7, this does not undermine our determination that defendant forfeited this claim. Had defense counsel objected, and had the People, as a result, successfully moved to amend the information, there would be no requirement that defendant be informed of the potential sentencing ramifications of the added allegation. (4 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Pretrial Proceedings, §§ 252 & 257, pp. 516-517, 522.)

28

enhancement to the jury. However, had defense counsel objected to the proposed charge, verdict form, or jury instruction as issued on the ground that the section 12022.7, subdivision (a), enhancement was not pleaded in the information, the prosecutor could have simply moved for leave to amend the information. (§ 1009 [court may permit amendment of an information for any defect or insufficiency at any stage of the proceedings]; *People v. Arevalo-Iraheta* (2011) 193 Cal.App.4th 1574, 1580-1581 [a court may allow amendment of an accusatory pleading at any time up to and including the close of trial so long as there is no prejudice to the defendant].) As the People observe, at the preliminary hearing, the trial court determined as to count two that sufficient evidence supported the related allegations that defendant committed premeditated attempted murder, and that defendant personally and intentionally discharged a firearm proximately causing great bodily injury. In light of these facts, as well as the fact that the trial court necessarily determined that issuing CALCRIM No. 3160, as modified, was warranted by the evidence at trial, we conclude that it is likely that, had defense counsel raised an objection, the trial court would have granted a motion by the People for leave to amend the information. Accordingly, whether counsel's performance in failing to register this objection fell below an objective standard of reasonableness, defendant has not established prejudice as he has not shown that it is reasonably probable he would have received a more favorable result had defense counsel objected to the section 12022.7, subdivision (a), enhancement. (See generally *In re Fields* (1990) 51 Cal.3d 1063, 1079 [there is no need to address the issue of whether counsel's performance was deficient when we can dispose of an ineffective assistance of counsel claim on the grounds of lack of prejudice].)

Nevertheless, the sentence imposed pursuant to section 12022.7, subdivision (a), must be stayed. Under section 12022.53, subdivision (f), "[a]n enhancement for great bodily injury as defined in Section 12022.7 . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to subdivision (d)" of section 12022.53

29

(§ 12022.53, subd. (f).) Where enhancements pursuant to sections 12022.53, subdivision (d), and 12022.7, subdivision (a), are both found to be true, the sentence imposed for the latter enhancement is to be stayed, not stricken. (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1124-1130 (*Gonzalez*).)

Here, the jury found to be true beyond a reasonable doubt both the enhancement pursuant to section 12022.53, subdivision (d), and the enhancement pursuant to section 12022.7, subdivision (a). The court imposed and executed sentences on both enhancements. However, pursuant to section 12022.53, subdivision (f), upon imposing and executing the sentence pursuant to section 12022.53, subdivision (d), the court was precluded from imposing and executing the sentence pursuant to section 12022.7, subdivision (a). Instead, section 12022.53, subdivision (f), required the court to impose and stay the section 12022.7 sentence. (*Gonzalez*, *supra*, 43 Cal.4th at pp. 1124-1130.) Therefore, we modify the judgment accordingly.

### IV. Sentence Imposed Pursuant to Section 190.2

Defendant asserts, and the People correctly concede, that the 25-years-to-life sentence imposed on count one concurrent to the 25-years-to-life sentence that court imposed for the murder is unauthorized and must be stricken. The court imposed this sentence pursuant to section 190.2, subdivision (a)(22). As defendant observes, the plain language of section 190.2, subdivision (a), only authorizes sentences of death or life imprisonment without the possibility of parole, and does not contemplate a sentence of 25 years to life. (§ 190.2, subd. (a).) Moreover, as defendant and the People agree, section 190.2, subdivision (a), does not authorize the imposition of a separate discrete sentence in addition to that imposed for the underlying murder. Instead, that section only provides that, if any of the enumerated special circumstances are found to be true, the sentence to be imposed on the conviction of murder in the first degree is death or life without the possibility of parole. (§ 190.2, subd. (a).) However, defendant was not eligible for a death sentence, as he was under the age of 18 at the time of the commission of the crime.

30

(§ 190.5, subd. (a).)  Additionally, even though the jury found true the special circumstance set forth in section 190.2, subdivision (a)(22), the court elected, at its discretion, to impose a sentence of 25 years to life on the underlying murder conviction, as it was authorized to do based on defendant's age.  (§ 190.5, subd. (b) ["The penalty for a defendant found guilty of murder in the first degree, in any case in which one or more special circumstances enumerated in Section 190.2 . . . has been found to be true under Section 190.4, who was 16 years of age or older and under the age of 18 years at the time of the commission of the crime, shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life."].)  Accordingly, the concurrent 25-years-to-life sentence imposed pursuant to section 190.2 was unauthorized and must be stricken.

## DISPOSITION

The sentence imposed pursuant to section 190.2, subdivision (a)(22), is stricken, the sentence imposed pursuant to section 12022.7, subdivision (a), is stayed, and the judgment is modified accordingly.  The trial court is directed to prepare an amended abstract of judgment reflecting these modifications and to forward certified copies of the amended abstract to the Department of Corrections and Rehabilitation.  The judgment is otherwise affirmed.

                                            MURRAY        , J.


We concur:



    NICHOLSON    , Acting P. J.



    HOCH        , J.

31